1 | **BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
2 | 9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
3 | Phone: (877) 534-2590
Facsimile: (310) 247-0160
4 | esmith@brodskysmith.com

5 | *Attorneys for Plaintiff David Dunham*

6 | **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
7 |

8 | DAVID DUNHAM, on behalf of     :     Case No.:
himself and all others similarly situated,     :
9 |                                      :
10 |          Plaintiff,              :     **CLASS ACTION COMPLAINT**
                                       :
11 |          vs.                     :
                                       :     **JURY DEMAND**
12 | INVENSENSE, INC., BEHROOZ ABDI,     :
AMIR FAINTUCH, EMIKO HIGASHI,     :
13 | JON OLSON, AMIT SHAH, ERIC     :
STANG, YUNBEI YU, USAMA     :
14 | FAYYAD, TDK CORPORATION, and     :
TDK SENSOR SOLUTIONS     :
15 | CORPORATION,     :
                                       :
16 |          Defendants.              :

17 |        Plaintiff David Dunham ("Plaintiff"), by his attorneys, on behalf of himself and those

18 | similarly situated, alleges upon personal knowledge as to his own acts and upon information and

19 | belief as to all other matters, based upon the investigation made by and through his attorneys,

20 | which investigation included, *inter alia*, the review of United States Securities and Exchange

21 | Commission ("SEC") filings, press releases, analyst reports, news articles and other materials, as

22 | follows:

23 | **NATURE OF THE CASE**

24 |        1.      Plaintiff brings this stockholder class action on behalf of himself and all other

25 | public stockholders of InvenSense, Inc. ("InvenSense" or the "Company"), against InvenSense,

26 | the Company's Board of Directors (the "Board" or the "Individual Defendants"), TDK Corporation

27 | ("TDK"), its affiliate TDK Sensor Solutions Corporation ("Merger Sub") (collectively,

28 | "Defendants"), in connection with their attempt to sell the Company to TDK by means of an unfair

process and for an unfair price. Plaintiff also brings claims against Defendants for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.    On December 21, 2016, InvenSense and TDK jointly announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") that will culminate in TDK, through Merger Sub, acquiring all of the outstanding shares of InvenSense. Under the terms of the merger agreement, InvenSense public stockholders will receive $13.00 in cash for every share of InvenSense common stock held, for an approximate aggregate value of $1.3 billion (the "Proposed Acquisition").

3.    By approving the Proposed Acquisition, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell InvenSense without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Acquisition to benefit themselves and/or TDK without regard for InvenSense public stockholders. Accordingly, this action seeks to enjoin the Proposed Acquisition and compel the Individual Defendants to properly exercise their fiduciary duties to InvenSense stockholders.

4.    Furthermore, the Individual Defendants, as defined herein, have exacerbated their breaches of fiduciary duty by agreeing to lock up the Merger with preclusive and onerous deal protection devices that preclude other bidders from making successful competing offers for the Company and act to render the Merger a fait accompli. For example, the Board agreed to: (i) a "no solicitation" provision that prevents the Company from negotiating with or providing confidential information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows TDK to match any competing proposal in the unlikely event that one emerges; and (iii) up to $46,700,000 in termination fees if the Board agrees to a competing proposal.

5.    Additionally, the process leading up to the proposed Acquisition may have been tainted because, in connection with the transactions contemplated by the Merger Agreement, the

vesting of all unvested options and unvested restricted stock units of the Company will be accelerated to be vested in full converting millions of dollars of currently illiquid stock into cash for certain Directors and Insiders of the Company. Furthermore, several InvenSense Directors and officers have lucrative change-in-control, or "golden parachute" clauses in their employment contracts, which, when triggered by their termination due to the consummation of the Proposed Transaction, will result in payment to them of, at the very least, hundreds of thousands of dollars. For example, Defendant Abdi will collect up to $7,872,751, representing a Golden Parachute award as well as currently illiquid large blocks of Company stock and options, as shown below:

| Name | Cash ($)(1) | Equity ($)(2) | Pension/ NQDC ($) | Perquisites /Benefits ($)(3) | Tax Reimbursements ($) | Other ($)(4) | Total ($) |
|------|------|------|------|------|------|------|------|
| Behrooz Abdi | 5,690,000 | 2,081,060 | — | 41,691 | — | 60,000 | 7,872,751 |
| Mark Dentinger | 560,000 | 3,900,478 | — | 34,623 | — | — | 4,495,101 |
| Daniel Goehl | 1,504,000 | 2,513,081 | — | 41,691 | — | — | 4,058,772 |
| Mozafar Maghsoudnia | 1,480,000 | 2,737,581 | — | 41,691 | — | — | 4,259,272 |

6.    In the Proxy Statement filed by the Company on Schedule 14A with the SEC on February 3, 2017 (the "Preliminary Proxy"), Defendants failed to disclose all material information necessary for InvenSense's stockholders to make an informed decision regarding the Proposed Transaction. Specifically, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Transaction; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinions" provided by the Company's financial advisor, Qatalyst Partners ("Qatalyst"); and (3) InvenSense's financial projections, relied upon by Qatalyst. The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision regarding whether to vote in favor or against the Proposed Transaction.

7.    In particular, the Preliminary Proxy is replete with statements by the Board to the effect that the Company's stock price did not represent the Company's "intrinsic value" because, for example, the Company had "invested in new technology that would enable product and customer diversification over the longer term." Preliminary Proxy at 32. As such, the Preliminary

Proxy states that in order to sell, the Board would have to be presented with an offer that properly reflected the intrinsic value and "not just a premium to market." *Id.*

8.    In fact, on October 28, 2016, the Board determined that it would take $14.00 a share to accept the TDK offer and tasked Qatalyst to advise TDK.  In early December, however, TDK advised that $13 a share was its final offer.

9.    One bidder did offer significantly more than the $13.00 deal price.  However, the Preliminary Proxy fails to adequately disclose or explain why the $15.00 per share offer could not be consummated.

10.    Additionally, the Preliminary Proxy fails to provide material financial forecasts prepared by the Company or to adequately explain why those forecasts were changed only weeks later in the lead up to the announcement of the deal.  The only way to address this material issue is to require the Company to disclose the "November Projections."

11.    Consequently, the Individual Defendants have breached their fiduciary duties of loyalty and due care, aided and abetted by InvenSense, TDK, and Merger Sub.

12.    Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the unreasonable steps taken by Defendants in entering into the merger agreement without attempting to maximize stockholder value in order to obtain millions of dollars in benefits for themselves.  Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.  Plaintiff, on behalf of the Class, seeks only to level the playing field and to ensure that if stockholders are to be ultimately stripped of their respective equity interests through the Proposed Acquisition, that the Proposed Acquisition is conducted in a manner that is not overtly improper, unfair and illegal, and that all material information concerning the Proposed Acquisition is disclosed to the InvenSense stockholders so that they are able to make informed decisions as to whether to vote in favor or against the Proposed Acquisition.

CLASS ACTION COMPLAINT

**PARTIES**

13.   Plaintiff is an individual that all times relevant hereto, has been an InvenSense stockholder and is a resident of Florida.

14.   Defendant InvenSense is a Delaware corporation with its principal place of business located at 1745 Technology Drive, Suite 200, San Jose, CA 95110.  InvenSense designs, develops, manufactures, markets, and sells sensor systems on a chip in the United States, China, Taiwan, South Korea, Japan, France, Canada, Slovakia, and Italy.  The Company offers accelerometers, gyroscopes, and microphones for the mobile, wearable, smart home, gaming, industrial, and automotive market segments. The Company delivers solutions based on motion and sound technology to smartphones, tablets, wearables, console and portable video gaming devices, digital television and set-top box remote controls, fitness accessories, sports equipment, digital still cameras, automobiles, ultra-books, laptops, hearing aids, stabilization systems, tools, navigation devices, remote controlled toys, and other household consumer and industrial devices. InvenSense also provides sensor data analytics platforms and services. The Company sells its products to consumer electronics device manufacturers, original design manufacturers, and contract manufacturers directly, as well as through distributors.  InvenSense also has a collaboration with Panasonic Corporation for the development of sensor technology solutions and automotive safety micro electrical mechanical systems based inertial sensors.  InvenSense common stock is publicly traded on the New York Stock Exchnage ("NYSE") under the symbol "INVN".  As of October 21, 2016, there were over 93 million common shares of InvenSense stock outstanding.

15.   Defendant Behrooz Abdi ("Abdi") has been a director of the Company at all relevant times.  Additionally, Abdi serves as the President and Chief Executive Officer ("CEO") of the Company.

16.   Defendant Amir Faintuch ("Faintuch") has been a director of the Company at all relevant times.   Additionally, Faintuch serves on the Board's Nominating and Corporate Governance Committee.

17.   Defendant Emiko Higashi ("Higashi") has been a director of the Company at all relevant times.  Additionally, Higashi serves on the Board's Audit Committee.

CLASS ACTION COMPLAINT

18.    Defendant Jon Olson ("Olson") has been a director of the Company at all relevant times. Additionally, Olson serves as the Chair of the Board's Audit Committee and is classified as a "Financial Expert" by the Board.

19.    Defendant Amit Shah ("Shah") has been a director of the Company at all relevant times. Additionally, Shah serves as the Chair of the Board's Compensation Committee.

20.    Defendant Eric Stang ("Stang") has been a director of the Company at all relevant times. In addition, Stang serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member on the Board's Audit Committee.

21.    Defendant Yunbei Yu ("Yu") has been a director of the Company at all relevant times. Additionally, Yu serves on the Board's Compensation Committee.

22.    Defendant Usama Fayyad ("Fayyad") has been a director of the Company at all relevant times. Additionally, Fayyad serves on the Board's Compensation Committee.

23.    Defendants Abdi, Faintuch, Higashi, Olson, Shah, Stang, Yu, and Fayyad identified in ¶¶ 15-22 are collectively referred to as the "Individual Defendants." By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with plaintiff and the other InvenSense public stockholders, and owe Plaintiff and other InvenSense stockholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

24.    Defendant TDK is a Japanese company with principle offices located at Shibura Renasite Tower, 3-9-1 Shibaura, Minato-Ku, Tokyo 108-0023, Japan.  TDK, together with its subsidiaries, manufactures and sells electronic components in Japan, Europe, China, Asia, the Americas, and internationally. TDK operates through Passive Components, Magnetic Application Products, Film Application Products, and Other segments. The Passive Components segment provides ceramic capacitors, aluminum electrolytic capacitors, film capacitors, high-frequency components, piezoelectric materials, circuit protection components, and sensors, as well as inductive devices, such as coils, ferrite cores, and transformers. The Magnetic Application Products segment offers recording devices, power supplies, and magnets. The Film Application Products segment provides energy devices, such as rechargeable batteries; and applied films. The

1   Other segment provides mechatronics production equipment, and other products. TDK primarily

2   serves electronics and automotive markets. TDK is traded on the Tokyo Stock Exchange under

3   the ticker code "6762."

4        25.    Defendant Merger Sub is a Delaware Corporation and wholly owned subsidiary of

5   TDK created for the sole purpose of effectuating the Proposed Acquisition. It can be served care

6   of Corporation Service Company, its registered agent, at 2711 Centerville Rd., Suite 400,

7   Wilmington, DE 19808.

8                           **JURISDICTION AND VENUE**

9        26.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

10  Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint

11  alleges violations of Section 14(a) and 20(a) of the Exchange Act.

12       27.    The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

13  to 28 U.S.C. § 1367, as such claims relate to Plaintiff's federal claims and form part of the same

14  case or controversy under Article III of the United States Constitution.

15       28.    Venue is proper in this Court because the Defendants reside, are found, have agents

16  and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

17                          **SUBSTANTIVE ALLEGATIONS**

18       ***Company Background***

19       29.    InvenSense designs, develops, manufactures, markets, and sells sensor systems on

20  a chip in the United States, China, Taiwan, South Korea, Japan, France, Canada, Slovakia, and

21  Italy.

22       30.    The Company offers accelerometers, gyroscopes, and microphones for the mobile,

23  wearable, smart home, gaming, industrial, and automotive market segments. The Company

24  delivers solutions based on motion and sound technology to smartphones, tablets, wearables,

25  console and portable video gaming devices, digital television and set-top box remote controls,

26  fitness accessories, sports equipment, digital still cameras, automobiles, ultra-books, laptops,

27  hearing aids, stabilization systems, tools, navigation devices, remote controlled toys, and other

28  household consumer and industrial devices. InvenSense also provides sensor data analytics

1  platforms and services.

2      31.    The Company sells its products to consumer electronics device manufacturers,

3  original design manufacturers, and contract manufacturers directly, as well as through distributors.

4  InvenSense also has a collaboration with Panasonic Corporation for the development of sensor

5  technology solutions and automotive safety micro electrical mechanical systems based inertial

6  sensors.

7      32.    InvenSense has a demonstrated history of financial success, recently evidenced by

8  its Financial 2017 Q2 financials that were released on November 3, 2016. Notably, the Company

9  announced that net revenue had increased 32% from Financial 2017 Q1. Additionally, GAAP

10  gross margins increased by an incredibly 41% from the previous quarter.

11      33.    Discussing these extremely positive results, Defendant Abdi noted, "[t]he

12  InvenSense team delivered solid results in the second fiscal quarter. We are encouraged that our

13  R&D investments are beginning to pay off with new design wins which we anticipate will allow

14  us to penetrate new markets." Abdi went on to discuss the positive future outlook of the Company,

15  stating, "…we believe this design win activity will position us for strong top line growth in fiscal

16  2018 as we strive to diversify our business."

17      34.    Such an incredible showing is not an anomaly for the InvenSense, but rather is

18  evidence of its trend of profitable results. For example, on July 28, 2016, the Company released

19  its Financial 2017 Q1 financial results, which displayed consistent GAAP gross margin strength

20  from the previous quarter. Speaking on these results, Defendant Abdi stated that, "…InvenSense

21  team delivered on our financial guidance, posting incrementally higher non-GAAP gross margins

22  in a competitive environment." Abdi further went on to highlight that the Company's success in

23  the quarter was a, "…result of improved manufacturing efficiency and product mix, as well as our

24  traction in both mobile and non-mobile markets. We are successfully leveraging investments in

25  our robust sensor platform to integrate and enable high-value, consumer-driven use cases, such as

26  image stabilization, augmented and virtual reality, and inertial navigation, for applications

27  spanning a number of vertical markets. These are creating exciting growth opportunities that we

28  believe play well into our focused strengths."

35.    Looking further back, the Company's strong financial performance is also evident in the previous financial year.  For example, on May 9, 2016, the Company issued its Financial 2016 Q4 and Full Year results, which Defendant Abdi spoke on, stating that "Q4 was a solid quarter, capping off a productive year for InvenSense."  Abdi went on to highlight the significant innovations that the Company had achieved during the financial year, which are poised to drive Company growth and success well into the future, stating, "Throughout fiscal 2016, we drove significant technology advancement in key use cases that are fueling sensor adoption today. These use cases can be applied across a variety of vertical markets and applications, which we believe will enable us to maximize our R&D investments and drive significant TAM expansion. Our market-leading solutions continued to gain traction in emerging Internet of Things (IoT) platforms such as drones, virtual and augmented reality, wearables, smart home, and industrial applications. We believe that the broad applicability of our portfolio positions us for continued diversification and growth in these exciting markets."

36.    Those in the media have not been silent about Company's positive financial outlook.  For example, Chris Neiger at *The Motley Fool* stated in a December 11, 2016 article that the Company was "seeking to end 2016 on a high note" by entering into a new partnership with China-based smartphone maker Oppo, which will see the Company supplying the electronic image stabilization sensors for Oppo's R9S and R9S Plus smartphones.

37.    Notably, according to Neiger's article, Oppo is the fourth-largest smartphone maker in the world and the largest vendor of smartphones in China.  Additionally, Oppo is growing quickly in China, India, and Indonesia, and other Asian markets.

38.    With Oppos' standing in the Asian and international markets, the announced partnership will surely be a large financial boon to InvenSense in the coming years, adding to their already positive financial results.

39.    Additionally, the new Oppo deal will allow InvenSense to diversify its revenue stream away from Apple, which has accounted for 58% of the total revenue for the Company in the most recent fiscal quarter, and over 53% of InvenSense's total revenue over the past six months.

CLASS ACTION COMPLAINT

By distancing itself from such exposure to one Company, the Oppo Deal will grant the Company much greater financial freedom and diversification in the future.

40.    Clearly, analysts have pegged InvenSense and its products to be on the cusp of major profits. However, due to the Directors' breach of fiduciary duty, aided and abetted by InvenSense, TDK and Merger Sub, Plaintiff and other members of the class of public InvenSense stockholders will forever be foreclosed from reaping the ultimate profits of their investments

### The Flawed Process Leading to the Proposed Acquisition

41.    Since at least November 2015, a number of entities have shown interest in entering into some form of strategic combination with the Company.

42.    In fact, on or about November 23, 2015, Company A made a verbal offer to acquire the Company for approximately $3.81 per share in stock and approximately $11.44 per share in cash. In December 2015, the Company advised Company A that the offer "undervalued InvenSense relative to the value reflected in the long-range plan." (Preliminary Proxy at 30.) Qatalyst provided advice to the Company regarding Company A; however, Qatalyst would not be formally engaged as the Company's financial advisor until September 27, 2016.

43.    Between February – April 2016, the Company had a number of meetings with TDK regarding possible collaborations and, eventually, regarding a possible acquisition of the Company.

44.    During this same time and continuing into May 2016, the Company had a number of meetings with Company B, Company C and Company D regarding strategic collaborations and/or acquisition. Moreover, on May 26, 2016, Company A reentered the picture with a written, non-binding offer for the acquisition of all of the outstanding common stock of InvenSense at a price per share of $8.25 in cash. Defendant Abdi had further conversation with Company A and learned that Company A sought a 45-day exclusivity period.

45.    The Board addressed Company A's offer at a meeting on June 16, 2016. The Preliminary Proxy makes vague reference to the participation of an unnamed investment bank in the meeting, notes a prior relationship between the bank and InvenSense, but notes that the investment bank was not engaged by InvenSense. At the meeting, Defendant Abdi indicated he

was scheduled to travel to Asia and Europe and could hold meetings with several strategic partners identified by the Board.  The Board determined to initiate "a process to explore various strategic alternatives to determine which strategic alternative would be in the best interest of InvenSense's stockholders, including remaining a standalone entity." Preliminary Proxy at 32.  The Board also tasked Defendant Abdi with engaging a financial advisor and formed a special committee (the "Strategic Committee"), composed of independent directors Emiko Higashi, Jon Olson, Amit Shah and Ben Yu, to oversee the process and the negotiation of the terms and conditions of any strategic transaction. *Id.*  The Strategic Committee did not have the authority to approve a binding definitive agreement on behalf of InvenSense.  According to the Preliminary Proxy, "[d]uring the process, 33 parties were contacted, 12 parties who demonstrated interest held meetings with InvenSense or received materials under non-disclosure agreements [NDAs], based on those meetings eight parties were provided a copy of InvenSense's long-range plan, eight parties were provided proposal process letters and three parties who made proposals to acquire InvenSense were granted access to InvenSense's data room."  The Preliminary Proxy fails to disclose if any of the NDAs contained a standstill provision or a Don't Ask, Don' Waive provision and whether any of the parties who entered into a NDA are currently proscribed from making an offer for the Company.

46.    Significantly, at the June 16th meeting, the Board "discussed InvenSense's current stock price and their view that it did not represent InvenSense's intrinsic value because InvenSense had invested in new technology that would enable product and customer diversification over the longer term. The Board of Directors then discussed how a proposal would need to reflect InvenSense's intrinsic value and not just a premium to market." *Id.*

47.    The Company sought to enter into an engagement letter with the investment banker with which it had a pre-existing relationship; however, the Strategic Committee determined that there were too many potential conflicts of interest to retain such investment bank.  The Preliminary Proxy fails to disclose the nature of the conflict and how, if at all, this conflict affected the strategic alternative process.

48.    The Preliminary Proxy does state that the Strategic Committee eventually picked Qatalyst as its financial advisor; however, while the Preliminary Proxy discloses that Qatalyst will

CLASS ACTION COMPLAINT

make $27 million dollars in fees (plus expenses) if the deal is consummated, the Preliminary Proxy fails to disclose if Qatalyst's massive payday would be different if InvenSense had chosen to engage in something less than a sale of all the whole Company.  As set forth further herein, this potential conflict of interest is significant given that $25.5 million of Qatalyst's fee is contingent on the consummation of the merger in the form agreed to.

49.    Between June and September 2016, the Company continued the strategic process, holding meetings with various entities regarding a number of possible strategic combinations/opportunities (Companies A-K), rejecting Company A's $8.25 proposal as not indicative of the Company's intrinsic value and further meeting with representatives of TDK. During this time, Defendant Abdi traveled to China to meet with eight potential strategic partners, including Companies F, G, H, I and J.

50.    On August 22, 2016, TDK again relayed its interest in acquiring the Company. According to the Proxy, Defendant Abdi advised TDK that the Board "believed that InvenSense's current stock price did not represent InvenSense's intrinsic value and that it would only consider a written offer that valued InvenSense significantly above market." *Id.* at 35.

51.    On September 12, 2016, Company A sent a revised, non-binding, written proposal with an offer price of $10.00 per share (60% cash/40% newly issued shares). Company A again required a 45-day exclusivity period.

52.    On September 14th the Strategic Committee met to discuss the overall process, the engagement of a financial advisor and Company A's latest interest.  Consistent with its position throughout the process, the Preliminary Proxy again notes that the Strategic Committee "discussed how InvenSense's current stock price was not reflective of InvenSense's intrinsic value and that all offers would need to include a premium that factored in such value." *Id.* at 36.

53.    On September 19, 2016, the Strategic Committee directed management to engage Qatalyst, which was formally engaged on September 27, 2016.

54.    On September 21, 2016, Defendant Abdi spoke to representatives of TDK, reminding them yet again that "the current stock price should not be used as an indication of InvenSense's intrinsic value because InvenSense had invested in new technology that would

enable product and customer diversification over the longer term" and that the Company would only consider and offer "at a substantial premium to market because InvenSense believed InvenSense's current stock price did not reflect InvenSense's intrinsic value." *Id.* at 37.

55.    On September 30, 2016, TDK sent Defendant Abdi a non-binding letter of intent providing for an all-cash acquisition of InvenSense at a proposed price of $10.00 to $11.00 per share.

56.    According to the Preliminary Proxy, on October 3, 2016, the Strategic Committee held a meeting wherein "[a] representative of Qatalyst Partners discussed with the Strategic Committee InvenSense's ongoing exploration of its strategic alternatives, including discussions with 25 potential strategic partners, including 11 other parties not mentioned above with whom InvenSense or representatives of Qatalyst Partners had initial conversations, but who would ultimately not participate significantly in the process. Representatives of Qatalyst Partners noted that two of these entities had declined further discussions. The representatives of Qatalyst Partners also discussed with the Strategic Committee an additional nine entities that had been identified as potential strategic partners, but at management's request had not been contacted for a variety of reasons, including for competitive reasons, the possibility of leaks, a lower probability of completion or that such parties were believed not to be likely to produce a proposal that was competitive or higher than the existing proposals from Company A and TDK Corporation. After consideration of these factors, the Strategic Committee decided not to expand the number of entities contacted at that time." *Id.* at 39.

57.    At the same meeting, the Strategic Committee set a deadline of October 26, 2016 for the receipt of proposals.  Throughout October, the Company and its representatives held meeting with various interested parties.

58.    On October 4, 2016, Company A was advised its offer did not reflect the intrinsic value of the Company and that the Company had received another proposal.  That same day, Defendant Abdi advised TDK its offer was too low and any further meetings would be contingent on TDK indicating a willingness to increase its offer.  On October 12, 2016, TDK sent

Defendant Abdi a revised non-binding, written proposal with a per share range of $11.00 to $12.00.

59.    According to the Preliminary Proxy, "[o]n October 18 and 19, 2016, representatives of Qatalyst Partners provided each of the eight parties that were responsive and had actively expressed interest in a transaction to acquire the entire company (including Company A, Company C, Company D, Company F, Company I, Company J, Company L, and TDK Corporation) with a process letter relating to the submission of proposals. The process letter instructed each party to submit its proposal by October 26, 2016." *Id.* at 42.    While discussions continued, as of the October 26th deadline, no other proposals were submitted.  Many of the entities advised, however, that they were still interested in the process.

60.    At a Board meeting on October 28, 2016, the Board determined that it would counter any further offer by TDK at $14.00 a share (the $14 ask was relayed to TDK on November 1, 2016) and continue to work with Company A to increase its offer but would not provide a counter. The Board also set a final proposal date for the first week in December.  The Preliminary Proxy does not disclose why the Board set this artificial date.

61.    On October 31, 2016, the Company, responding to rumors regarding the Company exploring strategic alternatives, issued a press release that while exploring all options, no decision had been made.

62.    Throughout November, the Company and its representatives discussed strategic alternatives with numerous entities, including TDK and Company A.

63.    On December 6, TDK submitted a written, non-binding proposal to acquire InvenSense for $12.50 per share and sought exclusivity.  TDK increased the offer to $13.00 per share on December 8, 2016 and advised the Company that it was its final offer.

64.    At a December 9, 2016 Board meeting, TDK's offer was contrasted to a joint venture proposed by Company E.  The Board of Directors determined that TDK Corporation's proposal was superior to the joint venture proposal of Company E due to the uncertainty of the milestone payments and value of the overall deal to InvenSense's stockholders.

65. On December 13, 2016, a financial sponsor of Company O, a Chinese entity, (which had contacted the Company in November but nothing had come from contact) sought access to the data room. Thereafter, on December 15, 2016, Company O provided Qatalyst with a non-binding, written indication of interest to acquire for cash all of the outstanding common stock of InvenSense at a price of $15.00 per share.

66. The Board met on December 16th to discuss the offer from Company O. Qatalyst and the Board discussed a number of purported issues with Company O's ability to finance and close the transaction, as well as possible regulatory issues. Notably, Qatalyst advised Company O that the process would not be slowed because of issues with Company O's ability to close -- even though the offer represented an almost 15% increase to TDK's final offer. The Board also addressed executive retention requirements of TDK.

67. On December 20th, Qatalyst informed the Board that Company O could not make an offer in the time allotted.

68. On December 21, 2016, the parties executed the merger agreement.

***The Proposed Acquisition***

69. On December 21, 2016, InvenSense and TDK announced the Proposed Acquisition. The press release stated in relevant parts:

> **TOKYO, Japan, SAN JOSE, California, U.S.A., December 21, 2016 -** TDK Corporation (President and CEO: Shigenao Ishiguro, hereinafter referred to as "TDK") and InvenSense, Inc. (President and CEO: Behrooz Abdi, hereinafter referred to as "InvenSense") entered into a definitive agreement today wherein TDK agrees to acquire all of the outstanding InvenSense shares for cash at an acquisition price of USD 13.00 per InvenSense share, for a total acquisition price of USD 1.3 billion. The transaction has been unanimously approved by the Boards of Directors of both companies. Completion of the transaction is expected in second quarter of the fiscal year ending March 31, 2018, and is subject to approvals by InvenSense shareholders and the relevant regulatory authorities. The acquisition will be completed through a merger of a newly created subsidiary of TDK with and into InvenSense, with InvenSense continuing following the merger as a wholly-owned subsidiary of TDK.
>
> TDK's current medium-term (3-year) management plan ending in March 2018 focuses on the importance of three areas: a) automotive, b) manufacturing devices and energy, and c) Information and Communications Technology (ICT). As part of its strategy for growth in these key areas, TDK has identified sensors and actuators, energy units and next-generation electronic components as three product areas for

strategic growth aimed at unlocking new business opportunities in the fields of Internet of Things (IoT). Sensors are viewed as an important IoT-enabling technology and TDK envisions greatly expanding this portion of its business and providing a broad range of sensor solutions to its customers. TDK currently sells magnetic sensors that employ thin-film magnetic technology, which TDK has accumulated through its endeavors with hard disk drive (HDD) solutions over many years. Further, TDK's product line includes pressure, temperature, electric current, and various other sensor types, and TDK plans to expand its sensor business going forward.

Through the acquisition of InvenSense, TDK will be able to strengthen its product line-ups and technologies, which is expected to enable the combined company to become a stronger player in broad based sensor solutions for IoT, automotive and ICT by accelerating the sensor product roadmap to offer innovative next generation products and platforms. In addition, sensor fusion, the combination of various sensor technologies and software creates products with enhanced value solutions for customers across multiple fields.

InvenSense is a world forerunner in motion sensor solutions, known mostly for its flagship six-axis and nine-axis motion sensors, which are used in some of the world's most advanced consumer products and applications. In recent years its portfolio has expanded with additional solutions for inertial, environmental, microphone, and ultrasonic sensors. InvenSense's "fabless" manufacturing model enables development of high-performance and cost effective products via its unique CMOS-MEMS production process. Enhanced by its value-added software solutions, InvenSense has expanded rapidly to become a worldwide strong player in sensors for consumer devices including smartphones, drones, wearables, gaming, inertial navigation, and both optical and electronic image stabilization for cameras. Looking ahead, growth avenues beyond mobile include large addressable opportunities in the fields of IoT, automotive, and industrial, driven by increasing consumer demand of indoor navigation, Virtual Reality (VR), Augmented Reality (AR), and Advanced Driver Assistance Systems (ADAS).

The acquisition will enable TDK to combine InvenSense's advanced suite of sensor and software platforms with its wide-ranging portfolio of magnetic, pressure, temperature, and microphone sensors. In addition, sensor fusion, combining various types of technologies and product line-up, creates products with high added value. Sensor fusion combines multiple sensors and software solutions that enables TDK to expand its business in the three key areas and further strengthening of its position as a global player in the sensor business, which is one of TDK's strategic growth products.

In January 2016, TDK established a joint venture with Qualcomm Incorporated, called RF360 Holdings Singapore PTE, Ltd., and has also entered into agreements to expand technical cooperation in a wide range of fields including passive components, batteries, wireless power transfer, sensors, MEMS and various other next-generation technologies for mobile communications, IoT, and automotive. This joint venture presents an exciting opportunity for InvenSense to expand its customer base in ICT (Information and Communications Technology), IoT and

CLASS ACTION COMPLAINT

automotive areas while enabling InvenSense to provide sensor solutions with increased synergies.

As the fields of ICT, automotive and industrial experiences growing demand for sensors, TDK, together with InvenSense, expect to provide unique products and sensor expertise across sales channels and a global customer base that TDK and InvenSense have each cultivated over several years. TDK and InvenSense are resolved to exhibit the same level of commitment to providing customers with quality, expert solutions and customer service as a combined company.

TDK's President and CEO, Mr. Shigenao Ishiguro, made the following statement regarding the acquisition:

"TDK's sensor business, one of its strategic growth areas, can be strengthened by merging TDK's portfolio of magnetic sensor technologies (where its strength lies) and its wide range of sensor products with InvenSense's expanding sensor technology. This acquisition is a fundamental element in TDK's strategy to provide unique and high-value-added products and services in IoT. We aim to become a strong player in the sensor business with InvenSense as our perfect partner."

InvenSense's President and CEO Behrooz Abdi made the following comment:

"This is an exciting day for InvenSense as our proposed acquisition by TDK represents what we view as a compelling win for InvenSense's shareholders, customers and employees. TDK understands the value of InvenSense's suite of sensor and software platforms. This merger is the culmination of years of innovation and execution by our world-class employees. Together with TDK, we see a bright future that leverages our commitment to innovation with TDK's scale, significant partner relationships and distribution channel. Our strategic goals are aligned, and we are confident that together with TDK we will accelerate our roadmap to provide next-generation sensor technologies in key fields for the world's most innovative companies."

In connection with the acquisition, BofA Merrill Lynch is acting as TDK's exclusive financial advisor and Jones Day is acting as legal counsel to TDK. Qatalyst Partners is acting as exclusive financial advisor and Pillsbury Winthrop Shaw Pittman LLP is acting as legal counsel to InvenSense.

### *The Inadequate Merger Consideration*

70.     Significantly, analyst expectations, the Company's strong recent performance, high likelihood of future, synergistic benefits to TDK, and the Company's oft-repeated belief in the intrinsic value of the InvenSense establish the inadequacy of the merger consideration.

71.     The compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company.  Pursuant to the terms of the Merger Agreement, the transaction values Company stock at approximately $13.00 per share. Significantly, analysts tracking the Company have valued the Company significantly higher in

CLASS ACTION COMPLAINT

recent months. Most notably within the last two years, financial analysts at Ascendant Capital Markets have valued the Company as high as $20.00 per share, a value 53.85% greater than that offered in the Proposed Acquisition. Moreover, InvenSense eschewed Company O's willingness to pay $15.00 a share for a deal almost 15% lower with TDK.

72.    Additionally, based on other similar transactions in the semiconductor field in the recent year, the Proposed Acquisition is woefully undervalued. For example, in a December 12, 2016, Seeking Alpha article, author Stone Fox Capital notes that similar deals in 2016 commanded a higher revenue to estimated value ratio than one present in the current Proposed Acquisition. For example, the article references the recent deal between NXP Semi and Qualcomm, categorizing it as typical for the industry, with a valuation multiple of approximately estimated value to revenues multiple of 4.3. Furthermore, the article estimates that the FY18 estimated revenues for InvenSense to be approximately $330 million, resulting in an estimated value of $1.419 billion. Significantly, this valuation, which is based on data from similar deals in the same time and industry as the Proposed Acquisition, is over $100 million *higher* than the valuation presented in the Proposed Acquisition.

73.    Furthermore, the consideration offered in the Proposed Acquisition does not take into account the considerable synergies afforded to TDK. Notably, TDK's President and CEO Shigenao Ishiguro commented on the strong synergies that TDK will reap from the Proposed Acquisition, stating, "TDK's sensor business, one of its strategic growth areas, can be strengthened by merging TDK's portfolio of magnetic sensor technologies (where its strength lies) and its wide range of sensor products with InvenSense's expanding sensor technology. This acquisition is a fundamental element in TDK's strategy to provide unique and high-value-added products and services in IoT. We aim to become a strong player in the sensor business with InvenSense as our perfect partner."

74.    Such statements regarding the Proposed Acquisition do not address the fact that the shares of InvenSense's common stockholders are being significantly undervalued, but instead focus on how this deal will help TDK at the expense of InvenSense and the Company's stockholders.

75.    Accordingly, and in breach of its fiduciary duties, the Board has denied InvenSense's stockholders the fair and adequate value of their investment by entering into the Proposed Acquisition for inadequate consideration.

### Preclusive Deal Mechanisms

76.    The Merger Agreement contains certain provisions that unduly benefit TDK by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that requires InvenSense to pay up to $46.7 million to TDK if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, InvenSense must pay this termination fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

77.    The Merger Agreement also contains a "No Solicitation" provision that restricts InvenSense from considering alternative acquisition proposals by, *inter alia*, constraining InvenSense's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an "*bona fide unsolicited written Acquisition Proposal*" if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

78.    Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide TDK information in order to match any other offer, thus providing TDK access to the unsolicited bidder's financial information and giving TDK the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of TDK.

CLASS ACTION COMPLAINT

79.    Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition and the Proposed Acquisition is the product of the Board's breaches of fiduciary duty, aided and abetted by InvenSense, TDK and Merger Sub.

***Conflicts of Interest***

80.    Company directors and officers will receive unique benefits in connection with the merger.

81.    Under the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, each outstanding Company option, equity award, or other right to purchase Company stock will vest and be cancelled in exchange for the right to receive the Merger consideration, instantly converting the large, illiquid holdings of many of the Individual Defendants and other Company insiders into cash.    Significantly, upon information and belief, members of the Company's Board and other Company insiders collectively own thousands of such options for which they will receive immediate liquidity.

82.    For example, the following table lists the outstanding Company options and equity awards as of the end of 2015, which would be subject to vesting should the Proposed Acquisition be consummated:

| Name | Cash Payment for "Single-Trigger" Awards | | | Cash Payment for "Double-Trigger" Awards | | | Total Cash Payment for Unvested Options, Unvested RSUs and Unvested Shares of Restricted Stock($) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Unvested Options($) | Unvested RSUs($) | Unvested Shares of Restricted Stock($) | Unvested Options($) | Unvested RSUs($) | Unvested Shares of Restricted Stock($) | |
| Behrooz Abdi | — | — | 97,500 | 1,593,560 | — | 390,000 | 2,081,060 |
| Mark Dentinger | | | | 1,982,978 | 1,917,500 | — | 3,900,478 |
| Daniel Goehl | 368,270 | 211,250 | 48,750 | 1,104,811 | 633,750 | 146,250 | 2,513,081 |
| Mozafar Maghsoudnia | 629,719 | 520,065 | — | 869,612 | 718,185 | --- | 2,737,581 |

83.    Moreover, certain employment agreements with several InvenSense officers or directors are entitled to severance packages should their employments be terminated under certain circumstances.    These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by InvenSense common stockholders.

84.    The following table sets forth the Golden Parachute compensation for certain InvenSense directors and officers, as well as their estimated value payable:

| Name | Salary Component ($) | Bonus Component ($) | Retention Bonus Component ($) | Additional Retention Bonus Component ($) | Total ($) |
|---|---|---|---|---|---|
| Behrooz Abdi | 630,000 | 630,000 | 1,000,000 | 3,430,000 | 5,690,000 |
| Mark Dentinger | 350,000 | 210,000 | — | — | 560,000 |
| Daniel Goehl | 315,000 | 189,000 | 1,000,000 | — | 1,504,000 |
| Mozafar Maghsoudnia | 320,000 | 160,000 | 1,100,000 | — | 1,580,000 |

85.    Thus, while the Proposed Acquisition is not in the best interests of InvenSense stockholders, it will produce lucrative benefits for the Company's officers and directors.

86.    Accordingly, Plaintiff seeks the following relief on his claims related to the omissions/misstatements of material information in connection with the Proposed Acquisition, including: (i) enjoinment of the Proposed Acquisition; or (ii) rescission of the Proposed Acquisition in the event that it is consummated and to recover damages resulting from Defendants' breaches of their fiduciary duties and/or aiding and abetting same.

**The Materially Misleading and/or Incomplete Preliminary Proxy**

87.    On February 3, 2017, the Company filed with the SEC a materially misleading and incomplete Preliminary Proxy that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

_Omissions and/or Material Misrepresentations Concerning the Sales Process Leading up to the Proposed Transaction_

88.    Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Preliminary Proxy fails to disclose the following information:

a.   The Preliminary Proxy fails to disclose if any of the NDAs contained a standstill provision or a Don't Ask, Don' Waive provision and whether any of the parties who entered into a NDA are currently proscribed from making an offer for the Company.

CLASS ACTION COMPLAINT

b.  The Company sought to enter into an engagement letter with the investment banker with which it had a pre-existing relationship; however, the Strategic Committee determined that there were too many potential conflicts of interest to retain such investment bank. The Preliminary Proxy fails to disclose the nature of the conflict and how, if at all, this conflict affected the strategic alternative process.

c.  The Preliminary Proxy discloses that Qatalyst will make $27 million dollars in fees (plus expenses) if the deal is consummated; however, the Preliminary Proxy fails to disclose if Qatalyst's massive payday would be different if InvenSense had chosen to engage in something less than a sale of all the whole Company – such as the joint venture with Company E. This potential conflict of interest is significant given that $25.5 million of Qatalyst's fee is contingent on the consummation of the merger in the form agreed to.

d.  The Preliminary Proxy fails to adequately disclose why Company management created the December Projections in such close proximity to the November Projections and the specific differences between the two sets of projections.

e.  The Preliminary Proxy fails to disclose the differences, if any, between the CFIUS investigation that would be undertaken as between TDK and Company O.

*Omissions and/or Material Misrepresentations Concerning InvenSense's Financial Projections*

89.    The Preliminary Proxy fails to provide material information concerning financial projections provided by InvenSense's management, reviewed with InvenSense and relied upon by Qatalyst in its analyses. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

90.    The Preliminary Proxy discloses the existence of the "November Projections," a set of projections created "[f]or strategic planning purposes and in connection with a potential sale transaction." *Id.* at 58. Moreover, "[t]he November Projections were furnished to Qatalyst Partners for use in their financial analyses. Before entering into the Merger Agreement, representatives of TDK Corporation conducted a due diligence review of the Company, and in connection with their review, TDK Corporation received certain non-public information concerning us, including a subset of the November Projections." *Id.*

91.     Significantly, the November projections were created at a time the Company was pursuing a transaction that would garner $14.00 a share.  It was not until December 6, 2016 that TDK made its $12.50 per share offer and December 8, 2016 when it made its final offer of $13.00 per share.

92.     For reasons that are not adequately explained in the Preliminary Proxy, at some point in December 2016, management felt it necessary to update the projections "in light of the six-month capital expenditure forecast" it had prepared. Moreover, management advised Qatalyst to rely on the December Projections for its analyses.

93.     The fact that the November Projections were created for the process and the December Projections were created in such close proximity raises significant questions as to why the December Projections were created and what changes were made to them. This is particularly relevant because there is no explanation given at all as to why the two sets were created and there is no narrative regarding any changes in the business to warrant the new set of projections.

94.     Without accurate projection data presented in the Preliminary Proxy, the Plaintiff and other stockholders of InvenSense are unable to properly evaluate the Company's true worth, the accuracy of Qatalyst's financial analyses, or make an informed decision whether to vote their Company stock in the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning Qatalyst's Financial Analyses*

95.     In the Preliminary Proxy, Qatalyst describes its fairness opinion and the various valuation analyses it performed to render its opinion.  However, Qatalyst description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

96.     For example, the Preliminary Proxy does not disclose material details concerning the analyses performed by Qatalyst in connection with the Proposed Transaction, including (among other things):

Discounted Cash Flow Analysis - (Preliminary Proxy at 65)

CLASS ACTION COMPLAINT

a. The individual inputs and assumptions utilized by Qatalyst to derive the discount rate range of 11.0% - 17.5% and why such a large range was selected.

b. How Qatalyst treated stock-based compensation expense in its analysis (i.e. as a cash expense or a non-cash expense).

c. The basis for utilizing a dilution factor for this analysis.

d. How Qatalyst determined the EV/NTM NOPAT of 10.5x-15.5x.

Selected Publicly Traded Companies Analysis – (Preliminary Proxy at 65)

a. The range of values implied by for (i) the Selected High Mobile Concentration Companies and for the Selected Sensors Companies.

b. Whether Qatalyst performed any type of benchmarking analyses for InvenSense in relation to the selected public companies?

c. Why Qatalyst did not utilize the November Projections in this analysis.

Selected Transactions Analysis - (Preliminary Proxy at 67)

a. The transaction price for each of the selected transactions.

b. Why the Company's NTM Revenue was calculated based on the Street Case and not the November Projections or December Projections.

c. The other metrics observed by Qatalyst in this analysis.

d. The basis for Qatalyst concluding that a "representative range" of multiples should be 1.5x-3.5x when the mean for the representative transactions was 3.6x.

e. Whether Qatalyst perform any type of benchmarking analyses for InvenSense in relation to the selected transactions.

97.   Without the omitted information identified above, InvenSense's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, InvenSense's public stockholders cannot gauge

CLASS ACTION COMPLAINT

the reliability of Qatalyst's fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.

98.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

99.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public stockholders of InvenSense and owe Plaintiff and the other members of the Class the duties of good faith, fair dealing, loyalty, and candor.

100.    By virtue of their positions as directors and/or officers of InvenSense, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause InvenSense to engage in the practices complained of herein.

101.    Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's stockholders, and with due care.  To diligently comply with these duties, the directors of a corporation may not take any action that:

        a.     Adversely affects the value provided to the corporation's stockholders;

        b.     Contractually prohibits them from complying with or carrying out their fiduciary duties;

        c.     Discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

        d.     Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's stockholders.

102.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated duties owed to Plaintiff and the other public stockholders of InvenSense, including their duties of loyalty, good faith, independence, and candor.

**CLASS ACTION ALLEGATIONS**

103.    Plaintiff brings this action as a class action, pursuant to FRCP 23, individually and on behalf of all holders of InvenSense common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

104.    This action is properly maintainable as a class action.

105.    The Class is so numerous that joinder of all members is impracticable.  As of October 21, 2016, there were over 93 million common shares of InvenSense stock outstanding, resulting in hundreds, if not thousands of stockholders.

106.    There are questions of law and fact which are common to the Class including, *inter alia*, the following:

a.    Whether the Proposed Acquisition is unfair to the Class;

b.    Whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

c.    Whether Defendants have breached their fiduciary and other common law duties owed by them to Plaintiff and the other members of the Class;

d.    Whether Defendants violated Federal laws;

e.    Whether the Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

f.    Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants;

g.    Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Acquisition; and

h.    Whether InvenSense, TDK or Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the other members of the Class in connection with the Proposed Acquisition.

CLASS ACTION COMPLAINT

107.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

108.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

109.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

### FIRST COUNT
**On Behalf of Plaintiff and the Class Against the Individual Defendants**
**For Breach of Fiduciary Duties**

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to InvenSense stockholders.

112.    By the acts, transactions, and courses of conduct alleged herein, Defendants individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class the true value of their investment in InvenSense.

113.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, independence, and candor owed to InvenSense stockholders because, among other reasons, they failed to take reasonable steps to obtain and/or ensure that InvenSense stockholders receive adequate consideration for their stock, agreed to restrictive deal protection devices that deter other suitors

from making a superior bid for the Company, and caused a materially incomplete and misleading Proxy concerning the Proposed Acquisition to be filed with the SEC.

114.    By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

115.    As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of InvenSense's assets and businesses, have been and will be prevented from obtaining a fair price for their shares of InvenSense common stock, and will not be able to cast an informed vote the Proposed Acquisition.

116.    Unless the Court enjoins Defendants, they will continue to breach their fiduciary duties owed to Plaintiffs and the members of the Class, all to the irreparable harm of the members of the Class.

117.    Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**SECOND COUNT**
**On Behalf of Plaintiff and the Class**
**Against InvenSense, TDK, and Merger Sub**
**<u>For Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty</u>**

118.    Plaintiffs incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    InvenSense, TDK, and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to InvenSense's stockholders, and have participated in such breaches of fiduciary duties.

120.    InvenSense, TDK, and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, InvenSense, TDK, and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Acquisition in breach of their fiduciary duties.

**THIRD COUNT**
**On Behalf of Plaintiff and the Class for Violations of Section 14(a)**
**of the Exchange Act and Rule 14a-9 Promulgated Thereunder**
**Against InvenSense and the Individual Defendants**

121.     Plaintiff repeats all previous allegations as if set forth in full herein.

122.     The Individual Defendants have issued the Proxy with the intention of soliciting stockholder support of the Merger.

123.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. 240.14a-9.

124.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

125.     The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

126.     The misrepresentations and omissions in the Proxy are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

127.     Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

**FOURTH COUNT**
**On Behalf of the Plaintiff and the Class for Violations of Section 20(a)**
**of the Exchange Act Against the Individual Defendants**

128.     Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other InvenSense stockholders.

129.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

130.    The Individual Defendants acted as controlling persons of InvenSense within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of InvenSense, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

131.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

132.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Proxy, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of this document.

133.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Preliminary Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

134.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

135.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-

9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B.    Declaring and decreeing that the Proposed Acquisition was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition;

C.    Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition;

D.    Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of InvenSense stockholders;

E.    Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.    Granting such other and further equitable relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT

1

**DEMAND FOR JURY TRIAL**

2   Plaintiff hereby demands a jury on all issues which can be heard by a jury.

3   Dated: February 24, 2017                    **BRODSKY & SMITH, LLC**

4

5   By: _____
    Evan J. Smith (SBN242352)

6   9595 Wilshire Boulevard, Suite 900
    Beverly Hills, CA 90212

7   Telephone:     (877) 534-2590
    Facsimile:     (310) 247-0160

8

9   *Attorneys for Plaintiff David Dunham*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT